**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| ROBERT PALUMBO, Individually and on Behalf of All Others Similarly Situated, | Case No.: |
| Plaintiff, | **CLASS ACTION** |
| v. | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| LORDSTOWN MOTORS CORPORATION AND STEPHEN S. BURNS, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Robert Palumbo ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by Lordstown Motors Corporation ("Lordstown" or the "Company") and related parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by the Company and other related parties; (c) review of news articles, shareholder communications, conference call transcripts, and analyst reports concerning the Company's public statements and those of its officers and directors, including Defendant Stephen S. Burns ("Burns"); and (d) review of other publicly available information concerning the Company.

## I.     NATURE OF THE ACTION

1.      Plaintiff brings this securities class action against Defendants Lordstown and Burns (collectively, "Defendants") on behalf of all persons or entities that purchased or otherwise acquired Lordstown common stock from October 26, 2020 through March 17, 2021, inclusive (the "Class Period"). The action alleges that Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Lordstown is an electric vehicle startup company.  Founded in 2018, Lordstown sought to become the first manufacturer of a full size, all-electric pickup truck.  The very next year, Lordstown acquired a shuttered 6 million square-foot factory from General Motors in Lordstown, Ohio that had once employed approximately 10,000 people.  Lordstown held itself out

as a savior of this Northern Ohio region that promised to transform the Mahoning Valley into the epicenter for electric vehicle production, which the Company dubbed "Voltage Valley."

3.    In June 2020, the Company revealed its "Endurance" electric pickup truck in a splashy ceremony that received national media attention. During the event, Defendant Burns, the Company's Chief Executive Officer ("CEO") heavily promoted the Endurance's growth prospects, declaring that "we have our whole year, our first year of production already pre-sold" and deliveries of the all-electric truck would begin in "early 2021."

4.    Just two months later, Lordstown announced that it had secured a remarkable $1.4 billion in pre-orders. On August 3, 2020, Defendant Burns appeared on CNBC's *Fast Money* to tout the purported popularity for the Endurance, stating that "we got 27,000 pre-orders and we got customers really really wanting the truck." In late September 2020, just weeks before going public on the NASDAQ through a special purpose acquisition company ("SPAC"), the Company announced that its book of pre-orders for Endurance now reached 40,000. Defendants represented that the purportedly large numbers of "pre-orders" for the Endurance represented strong commercial demand from actual customers operating fleets of trucks.

5.    On October 26, 2020, the first day of the Class Period, Defendant Burns specifically cited the 40,000 pre-order figure as "pent-up demand" for the Endurance and emphasized that "I don't think we've even scratched the surface." In November 2020, Lordstown stated that its pre-orders for Endurance now reached 50,000, and similarly assured investors that "[t]his figure does not capture interest the company has received from organizations that are not in position to be able to place pre-orders." In an interview on CNBC's *Mad Money* on November 17, 2020, Burns further assured investors that most of the pre-orders were signed by the CEOs of large firms, and were thus "very serious orders."

6.      By January 2021, the Company's announced pre-orders for Endurance soared to 100,000, which Defendants hailed as "unprecedented in automotive history" and put Lordstown in a position to "revolutionize the pickup truck industry."  In a February 23, 2021 interview with *Yahoo! Finance*, Defendant Burns reaffirmed the 100,000 pre-order figure and emphasized that Lordstown had "pre-sold 100,000 of these vehicles to various fleets across America— so really a big appetite."  Defendants continued to tout the strong demand for Endurance and the Company's growth prospects throughout the Class Period, consistently pointing to Lordstown's purported book of 100,000 pre-orders for the Endurance.

7.      However, as the Company knew but concealed from investors, a substantial amount of these "pre-orders" for Endurance consisted of orders from customers that did not operate commercial fleets or did not have the financial means to purchase the trucks.  Moreover, numerous orders were generated by a small consulting firm that was paid $30 to $50 for each "pre-order" it placed.  Defendants also hid from investors that the Company faced undisclosed production obstacles and, moreover, had not yet completed testing and validation required to meet federal safety standards.  According to a former Lordstown employee, these obstacles meant that, rather than being poised to capitalize on the strong demand for Endurance, production of the Endurance remained at least three to four years away throughout the duration of the Class Period.  As a result, Lordstown's Class Period representations about the purportedly strong demand for its electric vehicles as demonstrated through its large number of pre-orders for Endurance, as well as the Company's stated timeframes to produce and deliver the Endurance, were materially false and misleading.

8.      The truth began to emerge on March 12, 2021, when the investment research firm Hindenburg Research issued a scathing investigative report (the "Hindenburg Report") titled, "The

Lordstown Motors Mirage: Fake Orders, Undisclosed Production Hurdles, and a Prototype Inferno." Based on extensive research, including "conversations with former employees, business partners and an extensive document review," the Hindenburg Report revealed that Lordstown "is an electric vehicle SPAC with no revenue and no sellable product" that "misled investors on both its demand and production capabilities."  The Hindenburg Report concluded that Lordstown's book of 100,000 pre-orders for its proposed EV truck "are largely fictitious and used as a prop to raise capital and confer legitimacy."  Additionally, the Hindenburg Report estimated that the Endurance was in fact three to four years away from production, and cited as evidence an interview with a former Lordstown employee familiar with the production of Endurance who explained that the Company had built fewer than 10 prototypes to-date and had not completed any of the required testing and validation of the prototypes.  On this news, Lordstown's share price plummeted 17%, falling from a closing price of $17.71 per share on March 11, 2021 to $14.78 per share on March 12, 2021, a decline of $2.93 per share.

9.     Then, on March 17, 2021, during an earnings call with investors after market close, Defendant Burns disclosed that Lordstown was under investigation by the SEC.  During the call, Burns stated that the Company was cooperating with the SEC, and that Lordstown's board of directors had formed a special committee to conduct an internal inquiry.  On this news, Lordstown's share price plunged by nearly 14%, falling from a close price of $15.09 per share on March 17, 2021 to just $13.01 per share on March 18, 2021, a decline of $2.08 per share— representing a stunning 58% decline from the Class Period high.

10.     As a direct result of Defendants' materially false and misleading statements, and the sharp decline in the market value of the Company's shares, Plaintiff and other Class members have suffered substantial losses and damages.

## II.     JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b), Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District, as Lordstown is headquartered in this Judicial District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     PARTIES

15.     Plaintiff Robert Palumbo, as set forth in the accompanying certification, incorporated by reference herein, purchased Lordstown common stock during the Class Period, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein.

16.     Defendant Lordstown is a Delaware corporation with its principal executive offices located in Lordstown, Ohio. Lordstown's securities are traded on the NASDAQ under the symbol "RIDE."

17.     Defendant Burns is Lordstown's CEO and Chairman of its the Board of Directors, and served in these capacities throughout the Class Period.

18.     Defendant Burns, because of his positions with the Company, possessed the power and authority to control the contents of Lordstown's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Burns was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his positions and access to material non-public information, Defendant Burns knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading.  Defendant Burns is liable for the false statements pleaded herein, as those statements were each "group-published" information, and were the result of the actions of Burns and other officers and directors of the Company.

## IV.     <u>SUBSTANTIVE ALLEGATIONS</u>

### A.     **Background**

19.     Lordstown is an electric vehicle ("EV") company headquartered in Lordstown, Ohio. The Company's first production automobile is the Endurance, a full-size electric pickup truck that the Company claimed got about 250 miles of range on a single charge. According to the Company, the Endurance is powered by four electric hub motors, with each wheel having its own motor. Defendants promoted this technology as allowing the Endurance to deliver varying amounts of torque to each wheel—an important factor in selling pickup trucks as torque is critical when hauling heavy loads.

20.     Lordstown is an offshoot of Workhorse Group, Inc. ("Workhorse"), where Defendant Burns previously served as CEO until his ouster in February 2019.  Burns then formed Lordstown in June 2019 on the promise that the Company could revive General Motors' ("GM") recently shuttered manufacturing facility in Lordstown, Ohio, after which the Company was named.   On November 7, 2019, Lordstown entered into an agreement with Workhorse in which Workhorse would provide Lordstown intellectual property rights to a Workhorse small electric pickup truck in exchange for Workhorse acquiring a 10% equity stake in Lordstown.   On the same day, Lordstown announced it was acquiring the former GM manufacturing facility in Lordstown, funded by a $40 million loan from GM.

21.     On August 1, 2020, the Company announced that it entered into an agreement and plan of merger with DiamondPeak Holdings Corp ("DiamondPeak"), a SPAC, through which Lordstown would become a publicly traded company.  In announcing the merger, the Company issued a presentation that stated, under the heading "investment highlights," that demand for Endurance was "proven with pre-orders covering first year of production."  The presentation also characterized the Endurance as a "Revolutionary Vehicle for an Underserved Market."

22.     Two days later, on August 3, 2020, Burns appeared on CNBC's *Fast Money* to promote the Endurance.  During the broadcast, Burns stated that "we got 27,000 pre-orders" for the Endurance and "we got customers really really wanting the truck."  On September 23, 2020, the Company announced 40,000 pre-orders for the Endurance, which amounted to $2 billion in potential revenue.

### B.     Defendants' False and Misleading Statements During the Class Period

23.     The Class Period begins on October 26, 2020 when Lordstown issued a press release announcing that it would become a publicly traded company as a result of its acquisition by

and merger with DiamondPeak. In the release, Burns stated this was a "momentous occasion" for the Company and that Lordstown was "looking forward to combining the Company's EV startup culture with the infrastructure and assets we already have in place in order to successfully achieve our production milestones." Burns also represented in the release that the Company had "a near production-ready plant and approximately $675 million in proceeds from this transaction, which is more than enough funding to get us through initial production."

24.     In an interview with *The Business Journal* that same day, Burns highlighted that the Company's beta vehicles were "nearly production ready" and would launch into full production by September 2021. Burns also noted that the previously announced 40,000 pre-orders are "just a pent-up demand" for the first all-electric pickup truck in the market, and emphasized that, "I don't think we've even scratched the surface." On the first day of trading following the merger, Lordstown's stock price rose over 4% to close at $18.97 per share.

25.     On November 16, 2020, Lordstown issued a press release announcing recent commercial, operational and strategic developments, and assured investors that the Company remained on track to begin production of the Endurance in September 2021. The release stated that the Company had received 50,000 non-binding pre-orders from commercial fleets for the Endurance, adding that "[t]his figure does not capture interest the company has received from organizations that are not in position to be able to place pre-orders." In an interview on CNBC's *Mad Money* the following day, November 17, 2020, Burns declared "we sell to commercial fleets. That's our first customer. And like I said, we've already got 50,000 pre-orders." Burns went on to say that most of the orders are signed by the CEOs of large firms – "so very serious orders." In response to the release and Burns' statements on *Mad Money*, Lordstown stock price soared nearly $10 per share over the next two days, closing at $27.50 on November 18, 2020.

26.     On December 4, 2020, the Company filed a Prospectus Form 424 with the SEC in which the Company reported that it had received "pre-orders from fleet operators to purchase approximately 50,000 Endurance vehicles."

27.     Thereafter, the Company continued to promote the purportedly ever-increasing numbers of pre-orders for the Endurance.  On December 21, 2020, Lordstown announced that it received 80,000 non-binding reservations for the Endurance and that the Company remained on track to begin production of the Endurance in September 2021.  In a tweet promoting the news, the Company declared, "we have hit a new milestone."

28.     On January 11, 2021, Lordstown issued a press release announcing it had reached a record 100,000 pre-orders for Endurance, with an average order size of 600 vehicles per fleet.  In the release, Burns underscored that "[r]eceiving 100,000 pre-orders from commercial fleets for a truck like the Endurance is unprecedented in automotive history" and that the Company was in a position to "revolutionize the pickup truck industry."

29.     On January 28, 2021, the Company issued a press release quoting Burns that the Company remained on track to meet its "September start of production timeline while continuing to see indicators of strong demand for an all-wheel drive, full-size electric pickup truck."

30.     On February 23, 2021, Burns declared in an interview with *Yahoo! Finance* that the Company had "pre-sold 100,000 of these vehicles to various fleets across America— so really a big appetite." Burns also emphasized "there is a lot of demand and excitement" for the Endurance, and reaffirmed that "[p]roduction [of the Endurance] starts in September [2021]."

31.     The statements referenced in ¶¶22-29 were materially false and/or misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business and operations, which were known to Defendants or recklessly disregarded

by them.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the number of Endurance pre-orders was fabricated, and therefore inflated, and thus did not accurately reflect demand; (2) Lordstown had fabricated the pre-orders in order to give prospective investors a false sense of confidence; (3) the Company faced undisclosed production obstacles that would continue to delay production and delivery of the Endurance; and (4) as a result of the foregoing, Defendants' statements about Lordstown's business, operations, and prospects were false and misleading and/or lacked a reasonable basis. As a result, Defendants were able to artificially inflate the Company's financials throughout the Class Period.

### C.    The Truth Begins To Emerge

32.    On March 12, 2021, the Hindenburg Report was published before markets opened. In it, the investment research and reporting firm Hindenburg Research ("Hindenburg") revealed that the Company had "no revenue and no sellable product" and "misled investors on both its demand and production capabilities."  The Hindenburg Report found that "Lordstown's order book consists of fake or entirely non-binding orders, from customers that generally do not even have fleets of vehicles."

33.    In support of its findings, the Hindenburg Report stated that Hindenburg's "conversations with former [Lordstown] employees, business partners and an extensive document review show that the company's orders are largely fictitious and used as a prop to raise capital and confer legitimacy."  The Hindenburg Report cited several examples of "fake pre-orders" from the Company's purported 100,000 vehicle book from customers that did not operate a commercial fleet and/or did not have the ability to purchase the trucks.  For example, the Hindenburg Report highlighted a $735 million 14,000 truck order (representing almost 18% of the Company's pre-orders at the time) from a two employee non-registered corporation apparently operating out of an

individual's studio apartment, and a $52.5 million 1,000-truck order (representing ~13% of the Company's total order book) from a company whose mailing address was a UPS Store and had no fleet of its own or plan to actually purchase the vehicles.

34.     The Hindenburg Report further detailed how, in early 2020 and with a capital raise on the horizon, Burns was desperate to increase the number of Endurance pre-orders.   To accomplish this goal, the Company hired Climb2Glory, a small consulting firm.  Climb2Glory was paid $30-$50 per pre-order for the Endurance.  That company's website directly linked the pre-orders with Lordstown's ability to raise capital – "the more pre-orders achieved, the greater the confidence levels of prospective borrowers."

35.     The Hindenburg Report further described why the Endurance was actually three to four years away from production—a stark contrast to the Company's recent statements that it was on track to start production on the Endurance in September 2021.  Hindenburg based its finding on interviews with former Company employees and documents obtained through a Freedom of Information Act ("FOIA") request.  For example, the Hindenburg Report highlighted an interview with a former Lordstown employee who detailed how Lordstown had built fewer than 10 prototypes to date and had not completed any of the required testing and validation of the prototypes.

36.     In response to the release of Hindenburg Report, Lordstown's stock price fell $2.93 per share on March 12, from a close of $17.71 per share on March 11, 2021, to close at $14.78 per share on March 12, 2021, a decline of approximately 17%.

37.     Then, on March 17, 2021, the Company announced financial results for the fourth quarter of 2020, reporting a net loss of $101 million.  In a call with investors conducted after the market closed, Burns added to the bad news by disclosing that the SEC had launched an

investigation into the Company regarding the matters described in the Hindenburg Report. Burns stated that the Company's board of directors had formed a special committee to conduct an internal inquiry.

38.     On this news, Lordstown's share price fell another $2.08 per share, or nearly 14%, from a close of $15.09 per share on March 17, 2021, to just $13.01 on March 18, 2021, representing a 58% decline from the Class Period high.

## V.     CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Lordstown securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendant, any subsidiary or affiliate of Lordstown and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

40.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, Lordstown's securities were actively traded on the NASDAQ, an open and efficient market, under the symbol "RIDE." Millions of Lordstown shares were traded publicly during the Class Period on the NASDAQ. As of March 18, 2020, Lordstown had approximately 165 million shares of common stock outstanding. Record owners and the other members of the Class may be identified from records

maintained by Lordstown and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

41.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

42.     Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class and securities litigation.

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b)      whether Defendants participated in and pursued the common course of conduct complained of herein;

c)      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, and prospects of Lordstown;

d)      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Lordstown;

e)      whether the market price of Lordstown common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)      the extent to which the members of the Class have sustained damages and the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VI.     <u>UNDISCLOSED ADVERSE FACTS</u>

45.     The market for Lordstown's common stock was an open, well-developed and efficient market at all relevant times.  As a result of these materially false and misleading statements and failures to disclose described herein, Lordstown's stock traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased or otherwise acquired Lordstown's stock relying upon the integrity of the market price and market information relating to Lordstown and have been damaged thereby.

46.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Lordstown's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  These statements and omissions were materially false and

misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business, accounting, financial operations and prospects, as alleged herein.

47.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Lordstown's financial well-being and prospects.

48.    These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements made during the Class Period resulted in Plaintiff and the other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.

## VII.   <u>LOSS CAUSATION</u>

49.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Lordstown's common stock and operated as a fraud or deceit on Class Period purchasers of Lordstown's shares by failing to disclose to investors that the Company's business operations, financial results, and future prospects were materially misleading and misrepresented material information.   When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Lordstown's stock fell precipitously as the prior inflation was removed from

the share price.  As a result of their purchases of Lordstown's common stock during the Class Period, Plaintiff and the other Class members suffered economic loss.

50.     By failing to disclose the true state of the Company's business operations, financial statements, and future prospects, investors were not aware of the Company's true state.  Therefore, Defendants presented a misleading picture of Lordstown's business practices and procedures.  Instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Lordstown to conceal the truth.

51.     Defendants' false and misleading statements had the intended effect and caused Lordstown's common stock to trade at artificially inflated levels throughout the Class Period.  The stock price drops discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

52.     The decline in the price of Lordstown's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of Lordstown's common stock price declines negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Lordstown's securities and the subsequent decline in the value of Lordstown's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.   SCIENTER ALLEGATIONS

53.     As alleged herein, the Individual Defendant acted with scienter in that the Individual Defendant knew that the public documents and statements issued or disseminated in the

name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

54.     As set forth herein, Defendant Burns, by virtue of his receipt of information reflecting the true facts regarding Lordstown, his control over, receipt and/or modification of Lordstown's allegedly materially misleading statements and omissions, and/or his positions with the Company which made Burns privy to confidential information concerning Lordstown, participated in the fraudulent scheme alleged herein.

## IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

55.     At all relevant times, the market for Lordstown's common stock was an efficient market for the following reasons, among others:

a)     Lordstown stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient market;

b)     As a regulated issuer, Lordstown filed periodic public reports with the SEC and the NASDAQ;

c)     Lordstown shares were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

d)    Lordstown regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

56.    As a result of the foregoing, the market for Lordstown's common stock promptly digested current information regarding Lordstown from all publicly available sources and reflected such information in Lordstown's stock price. Under these circumstances, all purchasers of Lordstown's shares during the Class Period suffered similar injury through their purchase of Lordstown's stock at artificially inflated prices and a presumption of reliance applies.

57.    A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Lordstown's business operations and practices, financial results, and internal controls—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## X.    NO SAFE HARBOR

58.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when

18

made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

59.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Lordstown who knew that the statement was false when made.

## XI.    CLAIMS AGAINST DEFENDANTS

### COUNT I
**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

60.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against the Company and Burns.

61.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Lordstown securities; and (iii) cause Plaintiff and the other members of the Class to purchase Lordstown securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

62.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Lordstown securities in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendant is also sued herein as controlling person of Lordstown, as alleged herein.

63. In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. § 210.01, *et seq*.) and S-K (17 C.F.R. § 229.10, *et seq*.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

64. Lordstown and Burns, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Lordstown as specified herein. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Lordstown's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts, and omitting to state material facts necessary in order to make the

statements made about Lordstown and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Lordstown's securities during the Class Period.

65. Defendant Burns' primary liability, and controlling person liability, arises from the following facts: (i) Burns was a high-level executive and director at the Company during the Class Period; (ii) Burns, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) Burns was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) Burns was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

66. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing Lordstown's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, Burns, if he did not have actual knowledge of the misrepresentations and omissions alleged, was severely reckless in failing to

obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

67.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Lordstown securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Lordstown shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired Lordstown securities during the Class Period at artificially inflated high prices and were damaged thereby.

68.     At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Lordstown, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired Lordstown securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

69.     By virtue of the foregoing, Lordstown and the Individual Defendant each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

70.     As a direct and proximate result of the Individual Defendant's wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**Against Burns**

71.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is asserted against Burns.

72.     Burns was and acted as a controlling person of Lordstown within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, Burns had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Burns was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

73.     In addition, Burns had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

74.     As set forth above, Lordstown and Burns each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of his controlling positions, Burns is liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these

Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)   Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)   Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)   Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)   Awarding such other relief as this Court deems appropriate.

## XIII.  **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

DATED: March 19, 2021

*/s/ Scott D. Simpkins_____*
Scott D. Simpkins (0066775)
**CLIMACO WILCOX PECA
& GAROFOLI CO., LPA**
55 Public Square, Suite 1950
Cleveland, Ohio 44113
Telephone: (216) 621-8484
Facsimile: (216) 771-1632
sdsimp@climacolaw.com

*Local Counsel for Plaintiff*

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White, III

Lester R. Hooker
7777 Glades Road, Suite 300
Boca Raton, FL 3334
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

Steven B. Singer
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

David R. Kaplan
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com

-and-

Richard A. Maniskas, Esquire
RM Law, P.C.
1055 Westlakes Dr., Ste. 300
Berwyn, PA 19312
Telephone: (484) 324-6800
Facsimile: (484) 631-1305
rmaniskas@rmclasslaw.com

***Counsel for Plaintiff***